IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA

JONATHAN WOLFORD and
KENNETH MULLINS, JOSHUA McCOY,
and JAMES ADDAIR, Individually and
On Behalf of All
Others Similarly-Situated,

    Plaintiffs,                                         CLASS ACTION AND
                                                                  COLLECTIVE ACTION

v.                                                                Civil Action No. 1:24-cv-00028

UNITED COAL COMPANY LLC,                 JURY DEMANDED
WELLMORE COAL COMPANY, LLC,
and WELLMORE ENERGY COMPANY, LLC,

    Defendants.

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO COMPEL ARBITRATION AND STAY THE LAWSUITS OF JONATHAN WOLFORD, JOSHUA MCCOY, AND JAMES ADDAIR**

**COME NOW** Defendants United Coal Company LLC ("United Coal"), Wellmore Coal Company, LLC ("Wellmore Coal"), and Wellmore Energy Company, LLC ("Wellmore Energy") (hereinafter, the Defendants are collectively referred to as "Defendants"), by and through their undersigned counsel, and respectfully move this Honorable Court to stay the instant actions asserted by Jonathan Wolford ("Mr. Wolford"), Joshua McCoy ("Mr. McCoy"), and James Addair ("Mr. Addair") and compel their claims to arbitration pursuant to the written arbitration agreements Mr. Wolford, Mr. McCoy, and Mr. Addair executed with Wellmore Coal Company, LLC. In further support of this motion, Defendants state as follows:

**INTRODUCTION AND BACKGROUND**

This purported class and/or collective action contends that Defendants "violated the Fair Labor Standards Act ('FLSA') and Kentucky Wages and Hours Act ('KWHA') with respect to

1

Plaintiffs and the similarly-situated employees in three ways." [Pls.' Am. Compl., Doc. 24, at ¶ 2]. Namely, Plaintiffs contend that Defendants "required (or at the very least permitted) employees to engage in 'off-the-clock' pre-shift work . . . [,]" "deducted mid-shift time from employees for 'underground travel[,]'" and "required (or at the very least permitted) 'off-the-clock' post-shift work doffing (including placing on charge and storing for the next shift) protective clothing and equipment." [*Id.*]. Relying upon these allegations, Mr. Wolford, Mr. McCoy, and Mr. Addair assert claims under the FLSA, KWHA "(and, or in the alternative, under Virginia common law and/or the Virginia Overtime Wages Act) on behalf of themselves and all similarly-situated current and former employees of Defendants who worked for Defendants and were not fully-paid for their work, including their overtime work for Defendant for which Defendant should have paid such employees since March 9, 2017." [*Id.* at ¶ 55].

Mr. Wolford, Mr. McCoy, and Mr. Addair are named Plaintiffs in the action. *See id.* Mr. Wolford worked for Wellmore Coal as a Master Electrician, and he executed a "Mutual Arbitration Agreement" as a condition of his employment. A true and accurate copy of Mr. Wolford's executed "Mutual Arbitration Agreement" is attached hereto as **Exhibit 1**. Mr. McCoy worked for Wellmore Energy Company as a Roof Bolter Operator, Scoop Operator, and Continuous Miner Operator, and he also executed a "Mutual Arbitration Agreement" as a condition of his employment. A true and accurate copy of Mr. McCoy's executed "Mutual Arbitration Agreement" is attached hereto as **Exhibit 2.** Additionally, Mr. Addair worked for, and still works for, Wellmore Energy Company as a Scoop Operator, Belt Man, and Shuttle Car Operator, and he, too, executed a "Mutual Arbitration Agreement" as a condition of his

employment. A true and accurate copy of Mr. Addair's executed "Mutual Arbitration Agreement" is attached hereto as **Exhibit 3**.[1]

The Mutual Arbitration Agreements executed by Mr. Wolford, Mr. McCoy, and Mr. Addair cover not only Wellmore Coal, but also "its parents, subsidiaries, affiliates, successors, and assigns (including but not limited to United Coal Company LLC and its affiliates)," thus also extending to the claims asserted against Wellmore Energy and United Coal. Exs. 1–3 at 1.

Pursuant to the Mutual Arbitration Agreements, "the Parties agree[d] to resolve any and all disputes or controversies arising out of the employment relationship and/or termination of the employment relationship by submitting them to final and binding arbitration administered by the American Arbitration Association ('AAA')." *Id.* The "Covered Claims" section of the Agreements explicitly provides that the Agreements cover "any and all disputes or claims of any kind . . . under . . . the Fair Labor Standards Act . . . the common law of Virginia; and any other state or federal statutes, regulations, common law or other laws applicable to the employment relationship. Such claims may include (but are not limited to): . . . claims for wages or other compensation due . . . ." *Id.*

Notwithstanding their execution of the "Mutual Arbitration Agreement[s]," Mr. Wolford, Mr. McCoy, and Mr. Addair on behalf of themselves and others "similarly-situated," filed the instant action alleging violations of the Fair Labor Standards Act, Kentucky wage-and-hour laws, "(and, or in the alternative, under Virginia common law and/or the Virginia Overtime Wages Act) . . . ." [*See generally* Pls.' Am. Compl; *id.* at ¶ 55]. Such purported claims concern Mr. Wolford's, Mr. McCoy's, and Mr. Addair's employment with Wellmore Coal and its affiliates and arise under laws specifically provided for in the "Covered Claims" section of the Mutual

---

[1] A Declaration from Wellmore Coal Company, LLC's Human Resources Manager, Gary Prater, attesting to the accuracy of Mr. Wolford's, Mr. McCoy's, and Mr. Addair's arbitration agreements, and detailing their job duties, is attached hereto as **Exhibit 4**.

3

Arbitration Agreements. Therefore, in accordance with their Agreements, Mr. Wolford, Mr. McCoy, and Mr. Addair had to assert such claims through arbitration.

Mr. Wolford, Mr. McCoy, and Mr. Addair, however, failed to comply with their obligations to arbitrate their claims and, instead, have pursued resolution in this Court. Such conduct constitutes a breach of their Agreements, and Defendants now seek to compel the arbitration of Mr. Wolford's, Mr. McCoy's, and Mr. Addair's claims and stay their actions before this Court.[2]

## DISCUSSION

**A.     The Mutual Arbitration Agreements executed by Mr. Wolford, Mr. McCoy, and Mr. Addair are Enforceable Under the Federal Arbitration Act.**

In 1925, Congress enacted the Federal Arbitration Act ("FAA") "'to reverse the longstanding judicial hostility to arbitration agreements . . . and to place arbitration agreements upon the same footing as other contracts.'" *Green Tree Fin. Corp.-Ala. v. Randolph*, 513 U.S. 79, 89 (2000) (quoting *Gilmer v. Interstate/Johnson Lane Corp.,* 500 U.S. 20, 24 (1991)). Under the FAA, courts must direct the parties to proceed to arbitration on issues as to which an arbitration agreement exists, and courts are afforded no discretion on this issue. *See* 9 U.S.C. §§ 3–4; *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213 (1985). Section 2 of the FAA provides:

> A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such

---

2 The FAA requires a court to stay "any suit or proceeding" pending arbitration of "any issue referable to arbitration under an agreement in writing for such arbitration." 9 U.S.C. § 3. "This stay-of-litigation provision is mandatory. A district court therefore has no choice but to grant a motion to compel arbitration where a valid arbitration agreement exists and the issues in a case fall within its purview. *United States v. Bankers Ins. Co.*, 245 F.3d 315, 319 (4th Cir. 2001)." *Adkins v. Labor Ready, Inc.,* 303 F.3d 496, 500 (4th Cir. 2002).

> grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2.

"The FAA reflects a liberal federal policy favoring arbitration agreements . . . [and] [u]nderlying this policy is Congress's view that arbitration constitutes a more efficient dispute resolution process than litigation." *Adkins v. Labor Ready, Inc.*, 303 F.3d 496, 500 (4th Cir. 2002) (internal quotations and citations omitted). Thus, as federal courts have instructed, "due regard must be given to the federal policy favoring arbitration and ambiguities as to the scope of the arbitration clause itself resolved in favor of arbitration." *Volt Info. Sciences, Inc. v. Bd. of Tr. of Leland Stanford Jr. Univ.*, 489 U.S. 468, 475–76 (1989).

The Mutual Arbitration Agreements executed by Mr. Wolford, Mr. McCoy, and Mr. Addair specifically provide that they are "subject to the Federal Arbitration Act ('FAA')" and "shall be enforceable pursuant to and interpreted in accordance with the FAA." Exs. 1–3 at 3. The FAA includes within its scope statutory claims, such as claims under the Fair Labor Standards Act ("FLSA"). *See, e.g.*, *Poteat v. Rich Prods. Corp.*, 91 Fed. Appx. 832, 835 (4th Cir. 2004) (concluding that FLSA claims can be subject to arbitration and that arbitration agreements do not take away a party's statutory rights under the FLSA). In addition, courts have held that the FAA applies to employment-related claims (barring the exempted claims of "transportation workers"). *See also, Circuit City Stores v. Adams*, 532 U.S. 105, 123 (2001). Accordingly, Mr. Wolford's, Mr. McCoy's, and Mr. Addair's Agreements covering any employment-related disputes or claims, including those under state wage-and-hour laws, state common law, and the FLSA, is of a permissive scope. *See generally* Exs. 1–3 at 1.

In the Fourth Circuit, a party can compel arbitration under the FAA if it can demonstrate:

> (1) the existence of a dispute between the parties, (2) a written agreement that includes an arbitration provision which purports to cover the dispute, (3) the relationship of the transaction, which is evidenced by the agreement, to interstate or foreign commerce, and (4) the failure, neglect or refusal of [a party] to arbitrate the dispute.

*Am. Gen. Life & Accident Ins. Co. v. Wood,* 429 F.3d 83, 87 (4th Cir. 2008) (internal quotations omitted). In this case, Defendants can demonstrate all four factors. In addition, Defendants can demonstrate that neither Mr. Wolford, Mr. McCoy, or Mr. Addair meet the definition of a "transportation worker," and thus, do not qualify for the FAA's transportation worker exemption. *See* 9 U.S.C. § 1. For these reasons, Mr. Wolford's, Mr. McCoy's, and Mr. Addair's arbitration agreements with Defendants are binding and enforceable under the FAA, and Defendants respectfully request that the Court enter an Order requiring Mr. Wolford, Mr. McCoy, and Mr. Addair to arbitrate their federal and state wage-and-hour claims and common law claims and stay this action pending arbitration.

**B.     The Court Should Compel These Actions to Arbitration Because Defendants Satisfy Each of the Four Elements for Compelling Arbitration Under the FAA Prescribed by the Fourth Circuit.**

**1.     There is a dispute between the parties.**

The first element is satisfied because Mr. Wolford, Mr. McCoy, and Mr. Addair have filed the instant action alleging violations of the FLSA, violations of Kentucky wage-and hour laws, and/or violations of Virginia common law and Virginia wage-and-hour laws. *See generally* Pls.' Am. Compl. Defendants deny any such violations. Accordingly, there is a dispute between the parties.

**2.    The written arbitration agreements between Mr. Wolford, Mr. McCoy, Mr. Addair and Wellmore Coal are valid and enforceable under Virginia and Kentucky law and apply to their asserted claims.**

If the Court concludes that valid contracts exist, then it should stay these actions and order the parties to mediation and arbitration. *See* 9 U.S.C. § 3. As pled in the Amended Complaint, Mr. Wolford's, Mr. McCoy's, and Mr. Addair's allegations concern actions occurring in both Kentucky and Virginia. *See generally* Pls.' Am. Compl. Mr. Wolford's, Mr. McCoy's, and Mr. Addair's Agreements with Wellmore Coal are valid and enforceable under both state's laws.

Under Kentucky law, "[a] written agreement to submit any existing controversy to arbitration or a provision in written contract to submit to arbitration any controversy thereafter arising between the parties is valid, enforceable, and irrevocable, save upon such grounds as exist at law for the revocation of any contract." K.R.S. § 417.050. "The fundamental elements of a valid contract [in Kentucky] are 'offer and acceptance, full and complete terms, and consideration.'" *Energy Homes, Div. of S. Energy Homes, Inc. v. Peay*, 406 S.W.3d 828, 834 (Ky. 2013) (quoting *Commonwealth v. Morseman*, 379 S.W.3d 144, 149 (Ky. 2012)). Similarly, "Virginia courts rely on the general law of contracts in order to determine whether a valid and enforceable agreement to arbitrate exists between the parties in any given case." *Boyle v. Anderson*, 301 Va. 52, 54 (Va. 2022). "The existence of the contract [in Virginia] depends on actual acceptance of an offer. It is founded on mutual assent." *Id.* at 57. In this case, Mr. Wolford's, Mr. McCoy's, and Mr. Addair's Agreements with Wellmore Coal are valid and enforceable contracts under both state laws.

>    a.   **Wellmore Coal made valid offers to arbitrate, and Mr. Wolford, Mr. McCoy, and Mr. Addair accepted the offers.**

Here, there can be no dispute that Wellmore Coal and its affiliates extended valid offers to Mr. Wolford, Mr. McCoy, and Mr. Addair and that Mr. Wolford, Mr. McCoy, and Mr. Addair accepted the offers. Wellmore Coal, on behalf of itself, parents, subsidiaries, and affiliates, provided Mr. Wolford, Mr. McCoy, and Mr. Addair with copies of Mutual Arbitration Agreements, which constituted offers and outlined all of the terms and conditions of the Agreements. Mr. Wolford accepted the terms and conditions when he signed the Agreement on December 28, 2022. *See* Ex. 1 at 4. Mr. McCoy accepted the terms and conditions when he signed the Agreement on March 22, 2021. Ex. 2 at 4. Mr. Addair accepted the terms and conditions when he signed the Agreement on May 21, 2020. Ex. 3 at 4.

Their acceptances are emphasized by the language of the Agreements. The last sentence preceding the parties' signatures demonstrates assent: "The Parties have carefully read this Agreement in its entirety; fully understand and agree to its terms and provisions; and consent to be bound thereby." *See* Exs. 1–3 at 4. Notably, Mr. Wolford, Mr. McCoy, and Mr. Addair, in addition to a representative of Wellmore Coal, signed the Agreements under this acknowledgment. Thus, there can be no dispute that there have been valid offers and acceptances necessary to enforce the contracts under both Kentucky and Virginia law.

>    b.   **The parties' agreements to arbitrate are supported by adequate consideration.**

Additionally, the Mutual Arbitration Agreements are supported by valid consideration under both Kentucky and Virginia law. *See Energy Homes, Div. of S. Energy Homes, Inc. v. Peay*, 406 S.W.3d 828, 835 (Ky. 2013) ("[A]n arbitration clause requiring both parties to submit equally to arbitration constitutes adequate consideration." (internal quotations and citations

omitted)); *see also Price v. Taylor*, 251 Va. 82 (Va. 1996) ("Mutual promises in a contract constitute valuable consideration. Here the language in the contract reflects the mutual exchange of promises and alone is sufficient to constitute consideration for the contract.").

In this case, the Mutual Arbitration Agreements are supported by adequate consideration under Kentucky and Virginia law because all parties agreed to arbitrate any respective claims against one another. The Agreements highlight this mutual consideration, stating the following:

> **Mutual Consideration.**
>
> *By signing this Agreement, the Parties expressly exchange mutual promises to submit any covered employment-related dispute between them to binding arbitration. The Employee's promise to sign and return this Agreement to the Employer as a condition of employment, as well as the Employer's offer to employ and continue to employ the Employee (including compensation and benefits provided), are additional consideration for this Agreement.*

*See* Exs. 1–3 at 3 (emphasis added). The Mutual Arbitration Agreements at issue contain mutual promises to arbitrate, in addition to other detailed forms of consideration for each signing party. Thus, the Agreements are supported by adequate consideration, and the parties have enforceable contracts under Kentucky and Virginia law.

    c.    **Mr. Wolford's, Mr. McCoy's, and Mr. Addair's Claims are Within the Scope of their Mutual Arbitration Agreements.**

In their Amended Complaint, Mr. Wolford, Mr. McCoy, and Mr. Addair, on behalf of themselves and others "similarly-situated" allege violations of the Fair Labor Standards Act, Kentucky wage-and-hour laws, "(and, or in the alternative, under Virginia common law and/or the Virginia Overtime Wages Act) . . . ." [*See generally* Pls.' Am. Compl; *id.* at ¶ 55].

As previously stated, pursuant to the Mutual Arbitration Agreements, "the Parties agree[d] to resolve any and all disputes or controversies arising out of the employment

9

relationship and/or termination of the employment relationship by submitting them to final and binding arbitration administered by the American Arbitration Association ('AAA')." *Id.* The "Covered Claims" provision of the Mutual Arbitration Agreements explicitly provides that the Agreements cover "any and all disputes or claims of any kind . . . under . . . the Fair Labor Standards Act . . . .the common law of Virginia; and any other state or federal statutes, regulations, common law or other laws applicable to the employment relationship. Such claims may include (but are not limited to): . . . claims for wages or other compensation due . . . . " *Id.* The Mutual Arbitration Agreements, by their plain terms, encompass the claims asserted by Mr. Wolford, Mr. McCoy, and Mr. Addair in this action.

Nonetheless, to the extent that there is any uncertainty as to whether these Plaintiffs' claims are covered by the arbitration requirements in their Agreements, the United States Supreme Court has held that "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration," including circumstances where the issue is the construction of the contract language. *Moses H. Cone Mem'l Hosp. v. Mercury Construction Corp.*, 460 U.S. 1, 24-25 (1983). Given the broad ambit of the Mutual Arbitration Agreements' language, the presumption favoring arbitration, and the clear language of the "Covered Claims" portion of the Agreements, Mr. Wolford's, Mr. McCoy's, and Mr. Addair's claims are within the scope of the parties' arbitration agreements.

    **3.**    **The Mutual Arbitration Agreements and employment relationship between Mr. Wolford, Mr. McCoy, Mr. Addair and Wellmore Coal affect interstate commerce, and therefore, fall inside the scope of the FAA.**

The FAA applies to transactions or contracts "involving commerce." 9 U.S.C. § 2. A matter "involves" commerce under the FAA if it merely "affects" commerce, a standard commonly applied by the court to situations in which it is clear that Congress intended to

10

exercise its Commerce Clause powers to the fullest extent. *Allied-Bruce Terminix Co. v. Dobson*, 513 U.S. 265, 268, 273-74 (1995). The United States Supreme Court "has held that the phrase 'involving interstate commerce' includes employment contracts." *Webb v. Oaktree Med. Ctr., P.C.*, Civ. Act. No. 3:18-cv-00924, 2018 U.S. Dist. LEXIS 108185, *7 (D.S.C. June 28, 2018) (citing *Circuit City Stores, Inc.*, 532 U.S. at 113–114). Based upon such precedents and broad interpretations, these Plaintiffs' employment with Defendants and the Mutual Arbitration Agreements governing the same affect interstate commerce. Thus, the Mutual Arbitration Agreements fall under the scope of the FAA and should be enforced as written.

  **4. Mr. Wolford, Mr. McCoy, and Mr. Addair have refused to arbitrate their instant disputes.**

Rather than asserting their claims under final and binding arbitration administered by the American Arbitration Association as required by their Mutual Arbitration Agreements, Mr. Wolford, Mr. McCoy, and Mr. Addair filed this action against Defendants on behalf of themselves and others similarly situated. Thus, the fourth element of the Fourth Circuit's test for compelled arbitration is also satisfied. Since Defendants have made the requisite demonstrations concerning all four elements, Defendants request that the Court compel Mr. Wolford, Mr. McCoy, and Mr. Addair to arbitrate their claims under the FAA in accordance with the executed Mutual Arbitration Agreements.

**C. Mr. Wolford, Mr. McCoy, and Mr. Addair are not "transportation worker[s]" under Section 1 of the FAA, and are therefore not exempt from arbitration under the FAA.**

Seemingly acknowledging that Defendants have demonstrated the four requisite elements for compelling arbitration under the FAA, Mr. Wolford, Mr. McCoy, and Mr. Addair state in their Amended Complaint that they fall within the FAA's exemption for "'contracts of employment of seamen, railroad employees, or any other class of workers engaged

11

in . . . interstate commerce.'" *See* Pls.' Am. Compl. at ¶ 5. Mr. Wolford, Mr. McCoy, and Mr. Addair cite *Southwest Airlines Co. v. Saxon*, 596 U.S. 450 (2022) and *Bissonnette v. LePage Bakeries Park St., LLC*, 601 U.S. 246 (April 12, 2014) to allegedly support their position. However, the cases cited by Mr. Wolford, Mr. McCoy, and Mr. Addair, in addition to other cases interpreting the language of § 1 of the FAA, demonstrate that neither Mr. Wolford, Mr. McCoy, or Mr. Addair fall under the residual exemption clause for "transportation worker[s]."

In *Saxon*, the United States Supreme Court held that the canons of statutory construction "showed that §1 exempted only contracts with transportation workers, rather than all employees, from the FAA." *Saxon*, 596 U.S. at 458. The *Saxon* Court emphasized that, to qualify as a "transportation worker," an employee "must at least play a direct and 'necessary role in the free flow of goods' across borders." *Id.* (quoting *Circuit City Stores v. Adams*, 532 U.S. 105, 115, 121 (2001)). "The relevant question [for determining whether a worker fell under the Section 1 exemption] was what the employee does at the [employer], not what the [employer] does generally." *Bissonnette v. LePage Bakeries Park St., LLC*, 601 U.S. 246, 254 (2024) (internal quotation and citation omitted). Despite citing *Saxon* and *Bissonnette*, Mr. Wolford, Mr. McCoy, and Mr. Addair proceed to claim that their work with Defendants qualifies them as "transportation worker[s]" under § 1 of the FAA. It does not.

1. **Mr. Wolford's Job Duties**

Mr. Wolford worked as a Master Electrician with Defendants, and in that role, Mr. Wolford did not "play a direct and necessary role in the free flow of goods across borders." *Saxon*, 596 U.S. at 458 (internal quotations and citations omitted). The Southern District of Mississippi examined the job duties of an on-site electrician and determined that the position did not qualify as a "transportation worker" exempt from the FAA. *See Green v. TIC-The Indus. Co.*,

Civ. Act. No. 3:12-cv-153, 2012 U.S. Dist. LEXIS 150660, at *2 (S.D. Miss. Oct. 19, 2012) ("Because Green was employed as an electrician—not as a transportation worker—he is not covered by the Section 1 exemption."). Additionally, while the First Circuit Court of Appeals envisioned a situation where an electrician who both delivers and installs light fixtures on a "frequent basis" may qualify as a "transportation worker," it ultimately "question[ed], though, whether many electricians have substantial job duties that can be reasonably described in th[at] manner." *Fraga v. Premium Retail Servs.*, 61 F.4th 228, 242 (1st. Cir. 2023). Mr. Wolford does not complete deliveries or engage in job duties necessary and directly related to the interstate coal deliveries which Defendants provide.

2. **Mr. McCoy's Job Duties**

Mr. McCoy worked as a Roof Bolter Operator, Scoop Operator, and Continuous Miner Operator. In those roles, he also failed to "play a direct and necessary role in the free flow of goods across borders." *Saxon*, 596 U.S. at 458 (internal quotations and citations omitted).

The Seventh Circuit provided a detailed description of a Roof Bolter's job duties:

> But by definition, and as [the plaintiff] admitted at his deposition, the essential function of a roof bolter is to physically work on the roof of the mine. A roof bolter does sustained work over his head: he uses a pry bar to scale down the roof, carries packages of large bolts, bends them, operates a hydraulic machine to insert them into the ceiling, and torques them in with a wrench and tests their tightness.

*Cochrum v. Old Ben Coal Co.*, 102 F.3d 908, 912 (7th Cir. Dec. 17, 1996). A roof bolter's job duties do not alter based upon the circuit in which the mine is located. As a Roof Bolter Operator, Mr. McCoy would also *operate* a mechanized roof bolter, which would itself perform the above requirements. [*See* Declaration of Gary Prater, attached hereto as Ex. 4, at ¶ 23]. Neither physically roof bolting, or operating a mechanized roof bolter, would qualify Mr. McCoy

as a "transportation worker" exempt from the FAA. Mr. McCoy's job duties concerned physical alteration of the mine sites in order for other workers to safely mine coal. *See id.* Mr. McCoy was in no way involved in the transportation of the coal product.

While not as often, Mr. McCoy also occasionally worked as a Scoop Operator and Continuous Miner Operator, neither of which led him to "play a direct and necessary role in the free flow of goods across borders." *Saxon*, 596 U.S. at 458 (internal quotations and citations omitted). A Scoop Operator operates a piece of mining equipment called a "scoop," which possesses a "bucket" on the front end to scoop coal and other debris left by the mining process and to move it *intra-mine* to designated locations (typically the mining face where the continuous miner will mine). *See* Ex. 4 at ¶ 25. A scoop operator also applies rock dust in the newly mined areas to help suppress respirable coal dust. *See id.* Mr. McCoy, as a Scoop Operator, operated the scoop machine to clean newly mined areas by moving residual coal and other debris into designated *intra-mine* locations such as the mine face and subsequently applied rock dust in these areas. *See id.* A Continuous Miner Operator operates a self-propelled machine called a continuous miner, which has a rotating head with bits. The continuous miner rips coal from the mine face which is subsequently hauled by other pieces of machinery. *See id.* at ¶ 26. In this role, again, Mr. McCoy, worked *intra-mine* at designated sites operating the continuous miner to extract coal. *See id.* After extracting the coal, Mr. McCoy's job was done. In neither position did Mr. McCoy transport the coal.

3. **Mr. Addair's Job Duties**

Mr. Addair worked for, and still works for, Wellmore as a Scoop Operator, Beltman, and Shuttle Car Operator. *See id.* at ¶¶ 27, 29. Neither job title leads to Mr. Addair "play[ing] a direct

14

and necessary role in the free flow of goods across borders." *Saxon*, 596 U.S. at 458 (internal quotations and citations omitted).

As discussed above, a Scoop Operator typically drives and operates a mining vehicle called a "scoop," which possesses a "bucket" on the front end to push coal and other debris left by the mining process to designated ***intra-mine*** locations (typically the mining face where the continuous miner will mine). *See* Ex. 4 at ¶ 28. A scoop operator also applies rock dust in the newly mined areas. *See id.* At the times he worked as a Scoop Operator, Mr. Addair drove and operated the machine to remove residual coal and other debris to designated ***intra-mine*** locations such as the mine face and subsequently applied rock dust in these areas. *See id.* Mr. Addair's operation of the scoop in no way led him to "play a direct and necessary role in the free flow of goods across borders." *Saxon*, 596 U.S. at 458 (internal quotations and citations omitted).

A Beltman maintains the conveyor belts, which are required to move coal product from the mine sites to other locations, such as processing facilities. *See* Ex. 4 at ¶ 30. When performing this role, Mr. Addair performed cleaning and maintenance work related to the beltline. His duties included belt maintenance and rock dusting. *See id*. Mr. Addair, as a Beltman, never transported coal himself, and thus, did not "play a direct and necessary role in the free flow of goods across borders." *Saxon*, 596 U.S. at 458 (internal quotations and citations omitted).

Finally, pursuant to the Dictionary of Occupational Titles, a Shuttle Car Operator:

> Drives diesel or electrically powered shuttle car in underground mine to transport materials from working face to mine cars or to conveyor: Positions shuttle car under discharge conveyor of loading machine, and observes that materials are loaded according to specifications. Maneuvers shuttle car to keep its nose under discharge conveyor. Controls conveyor which runs entire length of shuttle car to apportion load as loading progresses. Drives loaded shuttle car to ramp and moves controls to discharge load into mine

15

> car or onto conveyor. May move mine cars into position to be loaded from shuttle car. May charge batteries when operating battery-powered vehicle.

Dictionary of Occupational Titles § 932.638-022. While Mr. Addair's Shuttle Car Operator job duties encompass driving and "transport[ing]," such driving and transporting occur ***intra-mine*** at designated sites. *See* Ex. 4 at ¶ 31. As the *Saxon* Court emphasized, to qualify as a "transportation worker," an employee "must at least play a direct and 'necessary role in the free flow of goods' **across borders**." *Id.* (quoting *Circuit City Stores v. Adams*, 532 U.S. 105, 115, 121 (2001) (emphasis added)). Mr. Addair's job, to the extent it implicates transportation, involves transporting coal from the mine face where it is mined to the feeder at the end of the mining section. *See* Ex. 4 at ¶ 31. This is all ***intra-mine*** transportation and is in no way involved, much less ***necessarily involved with*** "the free flow of goods across borders." *Saxon*, 596 U.S. at 458 (internal quotations and citations omitted).

Ultimately, the nature of Mr. Wolford's, Mr. McCoy's, and Mr. Addair's work does not qualify them as "transportation workers" exempt from the FAA. Thus, they are subject to the binding arbitration agreements they executed with Defendants.

**D.  Even if the Court finds that Mr. Wolford, Mr. McCoy, and/or Mr. Addair are "transportation worker[s]" under Section 1 of the FAA, and therefore exempt from the FAA, the Court should still require arbitration of their claims pursuant to the Uniform Arbitration Acts of Kentucky and Virginia.**

Finally, even if the Court determines that the FAA does not apply to Mr. Wolford's, Mr. McCoy's, and/or Mr. Addair's claims, the Mutual Arbitration Agreements they executed with Defendants are still enforceable under state law. *See, e.g.*, *Kauffman v. U-Haul Int'l, Inc.*, Civ. Act. No. 5:16-cv-04580, 2018 U.S. Dist. LEXIS 145717, at *10 (E.D.Pa. Aug. 27, 2018) ("The Court need not resolve these matters, however, because even if the eMove Agreement is exempt from the FAA, the Agreement's arbitration clause is nevertheless enforceable under

16

Pennsylvania law . . . ."); *Adams v. Parts Distrib. Xpress, Inc.*, Civ. Act. No. 2:20-cv-00697, 2021 U.S. Dist. LEXIS 52822, at *8 (E.D. Pa. March 22, 2021) ("[E]ven assuming, without deciding, that Adams was a transportation worker exempted from the FAA, the Court concludes that the arbitration agreement is still enforceable under Pennsylvania law."); *Amos v. Amazon Logistics, Inc.*, Civ. Act. No. 1:22-cv-55, 2022 U.S. Dist. LEXIS 107260, at *12 (M.D.N.C. June 16, 2022) ("Because the agreement to arbitrate is enforceable under applicable state law, the Court need not decide whether the FAA's transportation worker exemption applies."); and *Buckmire v. Lasership, Inc.*, Civ. Act. No. 1:20-cv-01493, 2022 U.S. Dist. LEXIS 178191 (E.D. Va. Sept. 29, 2022) (concluding that an arbitration agreement was valid and enforceable under the Virginia Arbitration Act after the parties concluded that the Federal Arbitration Act was not applicable due to the "transportation worker" exemption).

Both Kentucky and Virginia have enacted Uniform Arbitration Acts providing for the enforcement of arbitration agreements. Pursuant to Kentucky law, "[a] written agreement to submit any existing controversy to arbitration or a provision in written contract to submit to arbitration any controversy thereafter arising between the parties is valid, enforceable, and irrevocable, save upon such grounds as exist at law for the revocation of any contract." K.R.S. § 417.050.

Similarly, pursuant to Virginia law:

> A written agreement to submit any existing controversy to arbitration or a provision in a written contract to submit to arbitration any controversy thereafter arising between the parties is valid, enforceable and irrevocable, except upon such grounds as exist at law or in equity for the revocation of any contract. This article also applies to arbitration agreements between employers and employees or between their respective representatives unless otherwise provided in the agreement; provided, however, that nothing in this chapter shall be construed to create any right to arbitration with respect to any controversy regarding the

17

> employment or terms and conditions of employment of any officer or employee of the Commonwealth.

Va. Code Ann. § 8.01-581.01.

In this case, the Mutual Arbitration Agreements executed by Mr. Wolford, Mr. McCoy, and Mr. Addair satisfy all requisite elements of valid and enforceable contracts under both Kentucky and Virginia law. *See supra* Discussion.B.2. Accordingly, even if the Court determines that any of the Mutual Arbitration Agreements are not enforceable under the FAA, Defendants request that the Court hold the Agreements enforceable under state law and compel arbitration and stay the instant proceedings on those grounds.

## CONCLUSION

WHEREFORE, for the foregoing reasons, Defendants respectfully request that the Court enter an Order compelling Mr. Wolford, Mr. McCoy, and Mr. Addair to assert their claims in arbitration and staying their actions pending arbitration.

Respectfully submitted this 17th day of September, 2024.

**UNITED COAL COMPANY LLC,**
**WELLMORE COAL COMPANY, LLC,**
**and WELLMORE ENERGY COMPANY, LLC,**

/s/ Peter J. Raupp
Peter J. Raupp (Va. Bar No. 48689)
Steptoe & Johnson PLLC
707 Virginia Street East 17th Floor
P. O. Box 1588
Charleston, WV 25326-1588
Telephone: (304) 353-8000
Facsimile: (304) 353-8180
Peter.Raupp@Steptoe-Johnson.com

And

Jonathan R. Ellis (W. Va. Bar No. 10296)
Joseph U. Leonoro (W. Va. Bar No. 10501)
Steptoe & Johnson PLLC

707 Virginia Street East 17th Floor
P. O. Box 1588
Charleston, WV 25326-1588
Telephone: (304) 353-8000
Facsimile: (304) 353-8180
Jonathan.Ellis@Steptoe-Johnson.com
Joseph.Leonoro@Steptoe-Johnson.com
*Pro Hac Vice Forthcoming*

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA

| | |
|---|---|
| **JONATHAN WOLFORD and**<br>**KENNETH MULLINS, JOSHUA McCOY,**<br>**and JAMES ADDAIR, Individually and**<br>**On Behalf of All**<br>**Others Similarly-Situated,** | |
| Plaintiffs, | **CLASS ACTION AND**<br>**COLLECTIVE ACTION** |
| v. | Civil Action No. 1:24-cv-00028 |
| **UNITED COAL COMPANY LLC,**<br>**WELLMORE COAL COMPANY, LLC,**<br>**and WELLMORE ENERGY COMPANY, LLC,** | **JURY DEMANDED** |
| Defendants. | |

## CERTIFICATE OF SERVICE

I hereby certify that on the 17th day of September, 2024, I filed this *"Defendants' Memorandum of Law in Support of Their Motion to Compel Arbitration and Stay the Lawsuits of Jonathan Wolford, Joshua McCoy, and James Addair"* by using the CM/ECF system which will send notification of such filing to the following counsel of record:

Alexis Irene Tahinci
Tahinci Law Firm PLLC
105 Ford Ave., Suite 3
Kingsport, TN 37663
alexis@tahincilaw.com

John Kleinschmidt, III
John Kleinschmidt, Esq.
P.O. Box 1746
Lexington, KY 40588
hklaw.kleinschmidt@gmail.com

Mark N. Foster
Law Office of Mark N. Foster, PLLC
P.O. Box 869
Madisonville, KY  42431
Telephone: (270) 213-1303
Mfoster@MarkNFoster.com

/s/ Peter J. Raupp
Peter J. Raupp (Va. Bar No. 48689)

20