# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ABINGDON  DIVISION

CLERKS OFFICE U.S. DIST. COURT
AT ABINGDON, VA
FILED

January 28, 2025

LAURA A. AUSTIN, CLERK
BY:  s/ FELICIA CLARK
DEPUTY CLERK

JONATHAN WOLFORD, KENNETH )
MULLINS, JOSHUA McCOY, and )
JAMES ADDAIR, Individually and on )
Behalf of All Others Similarly Situated, )
)
        Plaintiffs, )     Case No. 1:24CV00028
)
v. )     **OPINION AND ORDER**
)
UNITED COAL COMPANY LLC, )     JUDGE JAMES P. JONES
WELLMORE COAL COMPANY, )
LLC, and WELLMORE ENERGY )
COMPANY, LLC, )
)
        Defendants. )

*Mark N. Foster, LAW OFFICE OF MARK N. FOSTER, PLLC, Madisonville, Kentucky, John R. Kleinschmidt, III, THE LAW OFFICES OF JOHN R. KLEINSCHMIDT, III, PLLC, Lexington, Kentucky, and Alexis I. Tahinci, TAHINCI LAW FIRM, PLLC, Kingsport, Tennessee, for Plaintiffs; Peter J. Raupp, Jonathan R. Ellis, and Joseph U. Leonoro, STEPTOE & JOHNSON PLLC, Charleston, West Virginia, for Defendants.*

In this wage-and-hour case brought by underground coal mine workers, the defendant employers have moved to compel arbitration under the Federal Arbitration Act (FAA).  The plaintiffs resist arbitration based on the transportation worker exemption of the FAA.  9 U.S.C. § 1.[1]  They center their argument on the fact that

---

[1]  The definition section of the FAA that includes the exception provides as follows:

    "Maritime transactions", as herein defined, means charter parties, bills of lading of water carriers, agreements relating to wharfage, supplies furnished vessels or repairs to vessels, collisions, or any other matters in

the underground coal mine operations in question straddle the state line between Virginia and Kentucky.  An underground conveyor beltline carries the coal, which is mined in Kentucky. The beltline breaches the surface in Kentucky and finally ends a short distance into Virginia, where it deposits the coal. Because of this interstate transit of the coal, the plaintiffs assert that the exception applies to their claims.

For the reasons set forth herein, I find that the plaintiffs are not transportation workers within the meaning of the exemption clause and thus the defendants' motion seeking arbitration will be granted.

## I. BACKGROUND.

Plaintiffs Jonathan Wolford and Kenneth Mullins filed the present collective and class action suit against United Coal Company LLC, Wellmore Coal Company, LLC, and Wellmore Energy Company, LLC.[2]  They seek unpaid wages and overtime

---

foreign commerce which, if the subject of controversy, would be embraced within admiralty jurisdiction; "commerce", as herein defined, means commerce among the several States or with foreign nations, or in any Territory of the United States or in the District of Columbia, or between any such Territory and another, or between any such Territory and any State or foreign nation, or between the District of Columbia and any State or Territory or foreign nation, *but nothing herein contained shall apply to contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce*.

9 U.S.C. § 1 (emphasis added).

[2]  The plaintiffs allege that defendant Wellmore Energy Company, LLC, listed itself as the employer on their paystubs, but that the other defendants "controlled Plaintiffs' employment and were joint employers."  Am. Compl. ¶¶ 35, 36, ECF No. 24.

compensation under the Fair Labor Standards Act and state wage-and-hour statutes for alleged off-the-clock work performed at the defendants' underground coal mines. An Amended Complaint added Joshua McCoy and James Addair as named plaintiffs.

Prior to the filing of the Amended Complaint, the defendants submitted a motion to compel arbitration and stay the claims of plaintiff Wolford based on a form arbitration agreement signed as a condition of employment. After the addition of the new named plaintiffs, the defendants filed a new motion similar in nature and referring to identical arbitration agreements signed by Wolford, McCoy, and Addair.[3] The three plaintiffs argue that they are exempt from the enforcement of their arbitration agreements solely because they are "transportation workers" as defined under precedent construing the FAA. The defendants argue that they are not. The defendants also argue that even if they are, the motion to compel should be granted under state law principles. However, because I find that the FAA exemption does not apply, I will not consider the state law issue.

In presenting the issues for the Court's determination, the parties have submitted affidavits, as well as exhibits, including photographs and a video of the property. While the plaintiffs suggest that discovery may be necessary for a resolution of arbitrability, I find that the present record is adequate.

---

[3] The defendants do not seek arbitration with the named plaintiff Kenneth Mullins, because he never signed an arbitration agreement for the reasons explained in the Amended Complaint. Am. Compl. ¶¶ 6, 33 n.4, ECF No. 24.

A. The Paw Paw 2 Mine.

The following facts are undisputed.

The three plaintiffs resisting arbitration worked or are still working at the Paw Paw 2 mine. The entrance to Paw Paw 2 is in Kentucky. All of the underground sections of the Paw Paw 2 mine that are actively being mined are in Kentucky. The plaintiffs acknowledge that the underground portions of the mine never expanded beyond Kentucky during the relevant time period. Pls.' Resp. Opp'n Defs.' Mot. Compel 4, 6, ECF No. 37.

The coal mining process begins by extracting coal from the coal seam. At Paw Paw 2, a continuous miner machine performs this task. The newly extracted coal is then moved away from the coal face. A scoop machine and a shuttle car perform this task. The scoop looks like an excavator, with a large mechanical arm attached to a bucket. It can move coal and debris produced during the mining process. A shuttle car is driven back and forth over distances of up to 750 feet to move coal to the feeder.

The feeder machine crushes the coal and loads it onto a beltline. The beltline is a large conveyor belt system. It conveys the crushed coal underground for several miles. The beltline at Paw Paw 2 comes above ground in Kentucky. Once it is on the surface, it continues in Kentucky and then crosses into Virginia where it travels

about 100 feet.[4]  The beltline comes to an end and the coal falls off the beltline onto a massive pile.  The coal is then loaded from the pile onto trucks, which transport it onwards, off the mine premises.

### B. The Type of Work Performed.

Wolford, McCoy, and Addair each have or had multiple roles at the Paw Paw 2 mine.  Wolford was an electrician who maintained the machinery described above. McCoy worked as a continuous miner operator, a scoop machine operator, and a roof bolter operator.  The roof bolter is a machine that inserts safety bolts in the roof and sides of the underground area being mined.  Addair still works at the Paw Paw 2 mine.  His roles are scoop machine operator, shuttle car operator, and beltman.  A beltman maintains the beltline.

It is not clear from the briefing if McCoy also drove shuttle cars like Addair. Whether he did does not affect his status, because none of the work that plaintiffs did renders them transportation workers.

---

[4]  The underground sections of some other mines operated by the defendants cross the border between Kentucky and Virginia.  The briefing does not identify which of these mines have underground sections which cross the state line.  However, it does mention that plaintiffs Wolford and McCoy also worked at the Paw Paw 1 mine and the Tilly mine, respectively.  Defs.' Mot. Compel Ex. 4, Prater Decl. 17, ECF No. 34-4.  The briefing does not describe the geographic location of the Paw Paw 1 mine or the Tilly mine, and the plaintiffs' arguments focus on the location of the Paw Paw 2 mine.  However, the degree to which the unnamed mines cross the state line underground and whether plaintiffs worked at such mines is irrelevant to my analysis.

## II.  STANDARD OF REVIEW.

"The standard for deciding a motion to compel arbitration brought under the FAA . . . is similar to the standard applicable to a motion for summary judgment." *Ayers v. Markiewicz*, 735 F. Supp. 3d 435, 441 (E.D.N.C. 2024), *aff'd*, No. 24-1541, 2024 WL 4490699 (4th Cir. Oct. 15, 2024) (unpublished).  A party may compel arbitration by demonstrating "(1) the existence of a dispute between the parties, (2) a written agreement that includes an arbitration provision which purports to cover the dispute, (3) the relationship of the transaction, which is evidenced by the agreement, to interstate or foreign commerce, and (4) the failure, neglect or refusal of the defendant to arbitrate the dispute."  *Adkins v. Labor Ready, Inc.*, 303 F.3d 496, 500–01 (4th Cir. 2002) (citation omitted).  The plaintiffs do not dispute that the defendants have demonstrated these four elements.

## III.  DISCUSSION.

### A. The Shifting Legal Background of Transportation Workers Under the FAA's § 1 Residual Clause.

The FAA exempts from its enforcement the arbitration agreements of "seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce."  9 U.S.C. § 1.  For employees who fall within this sentence, their employers cannot compel them under the FAA to arbitrate claims pursuant to arbitration provisions in their employment agreements.

The final clause in the exemption is called the residual clause.  To interpret who the residual clause covers, the Supreme Court applies the ejusdem generis statutory maxim.  *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 115 (2001).  In *Circuit City*, the Court stated that the residual clause should "be controlled and defined by reference to" the terms "seamen" and "railroad employees."  *Id.* Applying the maxim, the Supreme Court held that the residual clause covers a class of workers it calls "transportation workers." *Id.* at 109.[5]

Recently, the Supreme Court has provided two additional ground rules.  A transportation worker need not cross state lines to be covered.  *Sw. Airlines Co. v. Saxon*, 596 U.S. 450, 456 (2022).  The worker also need not work for an employer that operates in the transportation industry.  *Bissonnette v. LePage Bakeries Park St.,*

---

[5] The arbitration agreements at issue here contain an arbitrability clause as follows:

The Arbitrator, and not any federal, state, or local court or government agency, shall have exclusive authority to resolve any dispute relating to formation, interpretation, applicability, or enforceability of this Agreement, including without limitation any claim that this Agreement (or any part of it) is void or voidable.  The decision of an Arbitrator on any such issue or dispute, as well as on any Claim submitted to arbitration as provided in this Agreement, shall be final and binding upon the Parties, except as otherwise provided by applicable law.

Defs.' Mot. Compel Ex. 1, Mutual Arb. Agreement 2, ECF No. 34-1.  The parties do not suggest that the plaintiffs' status as transportation workers is an issue for the arbitrator, and not the court, to decide.  To be sure, the Supreme Court has held that disputes over the applicability of the § 1 exemption are for a court to decide.  *New Prime Inc. v. Oliveira*, 586 U.S. 105, 111 (2019).

*LLC*, 601 U.S. 246, 256 (2024).  This second rule is because the frame of analysis should not be the employer's business "generally," but what the worker does at the employer.  *Id.* at 254 (quoting *Saxon*, 596 U.S. at 456).

Besides seamen and railroad employees, the Court has specifically identified only a handful of workers who fall under the residual clause.  These include interstate truck drivers and the ramp agents who physically load and unload cargo from airplanes that travel across the country.  *New Prime Inc. v. Oliveira*, 586 U.S. 105, 113 (2019) (implicitly identifying truck drivers); *Saxon*, 596 U.S. at 463 (explicitly identifying ramp agents).

The Supreme Court has described the work that a class of workers must do to fall under the residual clause.  A transportation worker "must at least play a direct and 'necessary role in the free flow of goods' across borders."  *Saxon*, 596 U.S. at 458 (quoting *Circuit City*, 532 U.S. at 121).  In other words, "transportation workers must be actively 'engaged in transportation' of those goods across borders via the channels of foreign or interstate commerce."  *Id.* (quoting *Circuit City*, 532 U.S. at 121).  In *Bissonnette*, the Court reiterated those descriptions and the fact that § 1 should have a "narrow" scope.  *Bissonnette*, 601 U.S. at 256 (quoting *Circuit City*, 532 U.S. at 118).

This issue has rarely been addressed at the appellate level in the Fourth Circuit.  When it has, the analysis has largely been inapplicable to coal miners or

anyone working to extract natural resources. *O'Neil v. Hilton Head Hosp.*, 115 F.3d 272, 274 (4th Cir. 1997) (finding a respiratory therapist was not a transportation worker). The Fourth Circuit has taken a limited view of the exemption. It said that calling an employee a transportation worker when he is assigned only a "single transportation-related job during his entire tenure" at his employer "stretches" the exemption "past the breaking point." *Adkins*, 303 F.3d at 505. More recently, it recognized that "the Supreme Court has emphasized that the transportation worker exemption must be given a narrow construction." *Amos v. Amazon Logistics, Inc.*, 74 F.4th 591, 596 (4th Cir. 2023) (internal quotation marks and citation omitted).

Other circuits are split over who counts as a transportation worker. *See Singh v. Uber Techs., Inc.*, 67 F.4th 550, 553 (3rd Cir. 2023) (holding that Uber drivers are not transportation workers because they only "incidentally" cross state lines and work in the "fundamentally local transportation business") *cert. denied*, 144 S. Ct. 566 (2024) (denying certiorari two years after *Saxon*, 596 U.S. at 461, found that transportation workers need not cross state lines). *But see Rittmann v. Amazon.com, Inc.*, 971 F.3d 904, 915 (9th Cir. 2020) (holding that last mile delivery drivers who transport goods from Amazon warehouses to consumers without crossing state lines are transportation workers).

## B. The Parties' Arguments.

The plaintiffs structure their argument to a three-part analysis.  First, they argue that they are closely related to the beltline which moves coal originating from the Kentucky seam to the Virginia coal pile.  They are therefore "so closely related to [interstate transportation] as to be practically a part of it."  *Saxon v. Sw. Airlines Co.*, 993 F.3d 492, 501 (7th Cir. 2021) (citation omitted), *aff'd*, 596 U.S. 450 (2022).  Second, all the plaintiffs "worked on an intrastate leg of [the] interstate journey" of the coal.  *Id.*  Third, workers who themselves crossed the state line during the workday are "obvious" transportation workers.  *Id.*  Except for Wolford's work at mines besides Paw Paw 2, the plaintiffs' argument can be summarized by an excerpt from a footnote:  "[A]ll of the Plaintiffs were involved in the loading of Kentucky coal onto beltlines that crossed the state line into Virginia, and therefore were transportation workers."  Pls.' Resp. Opp'n Defs.' Mot. Compel 7–8 n.12, ECF No. 37.

The defendants argue that the plaintiffs are not transportation workers.  Their specific job duties did not constitute a "'direct and "necessary role in the free flow of goods" across borders.'"  Defs.' Mem. Supp. Mot. Compel 12, ECF No. 35 (quoting *Saxon*, 596 U.S. at 458).  Since most of the work involved moving coal exclusively underground within the mine — entirely within the state of Kentucky — they did not play a "direct and necessary role in the free flow of [coal] across [the

Kentucky-Virginia] border[]." *Id.* (internal quotation marks omitted). Addair, as the beltman, cleans and maintains the beltline that carries coal across the state line. But he is not a transportation worker because he "never transported coal himself." *Id.* at 15.

Both parties view the beltline as the sticking point. For the plaintiffs, the beltline transports the coal interstate. Everyone who touches the beltline is thus a transportation worker. And since the beltline is a stage in the coal's journey from the seam to the pile to the trucks that carry it onwards, everyone who works at any other stage of the journey is similarly part of its interstate transportation. For the defendants, none of the plaintiffs carried coal across the border like the beltline does, so they cannot claim whatever legal privileges may flow from proximity to it.[6]

The parties analogize to the types of work performed by the employees in *Saxon* and in cases decided in circuits around the country. But opinions in other circuits and the stated positions of the Supreme Court and the Fourth Circuit to keep the exemption narrow favor the defendants.

---

[6] I assume that the beltline is a channel of interstate commerce as contemplated by the Supreme Court's requirement. The requirement states that transportation workers must "be actively 'engaged in transportation' of those goods across borders *via the channels of foreign or interstate commerce*." *Saxon*, 596 U.S. at 458 (quoting *Circuit City*, 532 U.S. at 121) (emphasis added). If the beltline is not a channel of interstate commerce, the plaintiffs' arguments would be even weaker.

C. The Plaintiffs Do Not Play a
"Direct and Necessary Role"
in the Free Flow of Coal
Across the State Line.

A transportation worker "must at least play a direct and 'necessary role in the free flow of goods' across borders." *Saxon*, 596 U.S. at 458 (quoting *Circuit City*, 532 U.S. at 121). The "further removed" workers are from "the channels of interstate commerce or the actual crossing of borders," the less likely it is that they are transportation workers. *Id.* at 457 n.2. Because the plaintiffs worked to *mine* coal and were therefore removed from the process of *transporting* coal, they are not transportation workers. *Id.* at 458.

1. Shuttle Car Operators Are
Not Transportation Workers.

Shuttle car operators are addressed first because they demonstrate the need to characterize the different types of movement at issue here.

Addair (and possibly McCoy) drove shuttle cars that moved coal from the continuous miner to the feeder. The plaintiffs characterize this movement of the coal as an intrastate leg of the coal's interstate journey. They cite two circuits' applications of the exemption to last-mile delivery drivers who haul goods on intrastate legs of interstate journeys. Pls.' Resp. Opp'n Defs.' Mot. Compel 10, ECF No. 37.

But shuttle car drivers differ from last-mile Amazon delivery drivers. This is because the process that they operate in is different. Delivery drivers operate as part of "a process by which a delivery provider transfers the packages to a different vehicle for the last mile of the packages' interstate journeys." *Rittmann*, 971 F.3d at 916; *see also Brock v. Flowers Foods, Inc.*, 121 F.4th 753, 768 (10th Cir. 2024) (post-*Bissonnette* case applying the "process" analysis to the mechanics of baked goods deliveries). For shuttle car operators at Paw Paw 2, however, the process is not one of delivery or transportation. It is one of coal extraction. The shuttle car does literally transport the coal from one place in the mine operation to another. But the overall process of which this movement is part is not of the type contemplated by the FAA. The shuttle car's movement of the coal is part of the mine's internal production process that transforms freshly mined coal into crushed coal, which is what the beltline conveys into Virginia. The transfer merely completes the process of mining, that is, turning the solid coal seam into usable coal. The movement of packages, by contrast, during intrastate legs of interstate journeys is part of a process of transportation.

To be clear, transportation workers need not work in the transportation industry. What matters is not the employer's industry or what the employer "does generally" at all, but the work that the employee does. *Saxon*, 596 U.S. at 456. The Supreme Court rejected the Second Circuit's use of a test to determine whether an

employer was operating in the transportation industry. *Bissonnette*, 601 U.S. at 254. Industry-focused tests would complicate a "simple motion to compel arbitration" by leading to "arcane riddles about the nature of a company's services." *Bissonnette*, 601 U.S. at 254.

But courts must still place the movement of the goods at issue within some overall operation of the business. For example, if courts could not examine the source of boxes picked up from a warehouse and delivered intrastate, they would have no basis to conclude that the local delivery was a leg of a larger interstate journey. *Waithaka v. Amazon.com, Inc.*, 966 F.3d 10, 22, 26 (1st Cir. 2020) (applying the intrastate leg theory to last-mile Amazon delivery drivers); *see also Brock*, 121 F.4th at 768. The Supreme Court in *Saxon* recognized that courts must still consider where employees fit into the business' operations when it wrote that "the answer [of who is a transportation worker] will not always be so plain when the class of workers carries out duties further removed from the channels of interstate commerce or the actual crossing of borders." 596 U.S. at 457 n.2. Those duties have to be contextualized within the overall processes of the movement of goods.

Similarly, the plaintiffs' duties to move coal around must be contextualized within the mine's overall operations. The shuttle car moving coal intra-mine is part of the mining process undertaken by the employees working inside the mine. It is not part of the coal's interstate transportation process.

The plaintiffs also argue that the shuttle cars are similar to the vehicles used by Southwest to load and unload cargo onto airplanes. Pls.' Resp. Mot. Stay Disc. 7 n.5, ECF No. 42. The shuttle cars have four wheels, a driver's seat, and a platform on which to load multiple tons of coal. The Southwest vehicles have four wheels, a driver's seat, and a conveyor belt that can be raised at an angle to convey bags from the tarmac to the airplane's cargo hold. *Id.* The ramp agents in *Saxon* who were found to be transportation workers also stayed within the airport's premises in the same way the shuttle car operators only drive the cars inside the mine. But the nature of the movement is again different. For ramp agents, the immediate context of the movement is to load luggage onto an airplane so that it can be transported with the plane. For shuttle cars, the immediate context of the movement is to move coal to a feeder machine to be crushed. The Supreme Court has said that loading and unloading goods alone cannot turn someone into a transportation worker even when those goods eventually travel interstate. *Bissonnette*, 601 U.S. at 256. Similarly, physically moving goods that at some point travel interstate is not enough to be a transportation worker.

The plaintiffs cite to a 1920 case to further argue that the transportation of the coal within the mine is a leg in its interstate journey. Pls.' Resp. Opp'n Mot. Compel 11–12, ECF No. 37. In that case, an employee "belonged to a crew operating a train of loaded cars from Locust Gap colliery to Locust Summit yard, two miles away."

*Phila. & Reading Ry. v. Hancock*, 253 U.S. 284, 285 (1920). Some of the train cars had out-of-state destinations. The employee was found to be "employed in commerce between states" because "the shipment was but a step in the transportation of the coal to real and ultimate destinations in another state." *Id*. at 285–86. The defendants argue that *Hancock* is inapplicable because the plaintiffs are coal miners and the employee was a trainman. Defs.' Reply Resp. Mot. Compel 8, ECF No. 41. In fact, Congress addressed a strikingly similar issue in 1940.

Fifteen years after enacting the FAA, Congress updated the definition of "employee" in six different railroad employee-related laws. Act of Aug. 13, 1940, ch. 664, 54 Stat. 785 (providing for more uniform coverage of persons employed in coal mining operations). These laws created tax, insurance, and dispute resolution schemes specifically for railroad employees. The updated definition reads: "The term 'employee' shall not include any individual while such individual is engaged in the physical operations consisting of the mining of coal, the preparation of coal, the handling (other than movement by rail with standard railroad locomotives) of coal not beyond the mine tipple, or the loading of coal at the tipple." *Id.* at 786.

The relevant background comes from debate over the bill in the House of Representatives in August 1940. Certain railroad companies had owned three or four large mines in the United States. Previously, coal miners were regulated under social security laws. The question arose whether coal miners were railroad

16

employees because they worked at mines owned by railroads. The amended definition of "employee" was meant to answer that question in the negative. 86 Cong. Rec. 9891 (1940) (statement of Rep. Keller).

This amendment is relevant because it confirms the defendants' position. Coal miners are not trainmen when their work takes place before the mine tipple, even if their mine is owned by a railroad. The Paw Paw 2 mine is not owned by a railroad, but that only shows that the plaintiffs are even less trainmen than they would be if it was. Even though the trainmen in *Hancock* were "employed in commerce between states," Congress has articulated the difference between trainmen and coal miners who stay on the other side of the tipple. 253 U.S. at 285. This difference echoes the distinction expressed between the work of a shuttle car operator and a ramp agent or delivery driver: The plaintiffs were part of a class of workers engaged in coal mining, not in the transportation of coal. Operating a shuttle car does not make an employee a transportation worker.

2. Continuous Miner Operators, Scoop Machine Operators,
Roof Bolter Operators, and Electricians
Are Not Transportation Workers.

The plaintiffs' other roles were continuous miner operator, scoop machine operator, roof bolter operator, and electrician. None of the roles qualify them as transportation workers.

First, the continuous miner is a machine that rips coal out of the seam. Plaintiffs argue that it is another unit of the intrastate leg of the coal's interstate journey. They also argue that the continuous miner has a conveyor system to transport coal from the mine face to a location where the shuttle car can pick it up. This provides the continuous miner with a "transportation aspect." Pls.' Resp. Opp'n Defs.' Mot. Compel 11, ECF No. 37. Applying the shuttle car reasoning to the continuous miner, however, the extraction of coal from the seam is even farther away from the coal's interstate transport. This distance is measured figuratively and geographically within the mine. More intensely than the shuttle car, the nature of the coal's movement is extraction during the mining process, not interstate transport.

A scoop machine operator is also not a transportation worker. Employees use the scoop machine to move "coal and other debris left by the mining process" within the section of the mine to which they are assigned. Defs.' Mem. Supp. Mot. Compel 14, ECF No. 35. The plaintiffs do not allege that the scoop machine ever moved coal outside of the mine. Whatever movement of the coal that the scoop enabled, it was part of the extraction process. For the same reason as operators of the continuous miner and shuttle car, scoop machine operators are not transportation workers.

The roof bolter operator fares worse. In that position, the employee never handles coal or machinery that handles coal. The work is limited to bolting the

mine's roof and sides to ensure their structural integrity. In fact, the plaintiffs' provide no argument specific to roof bolters as to why their work plays a "direct and necessary role in the free flow of [coal] across borders." *Saxon*, 596 U.S. at 458 (internal quotation marks and citation omitted). The Supreme Court has given an example of janitors who work at a business engaged in interstate commerce as being insufficiently "connected to … instrumentalities of interstate commerce." *Saxon*, 596 U.S. at 462 (internal quotation marks and citation omitted). While the roof bolters certainly require more technical knowledge and skill than janitors, the fact that they do not handle the coal or any machinery that handles the coal shows their overly distant removal from the coal's interstate journey.

An electrician is also not a transportation worker. Plaintiffs argue that the "entire process of mining coal underground depended on numerous large electrical machines." Pls.' Resp. Opp'n Defs.' Mot. Compel 4, ECF No. 37. It was Wolford's job to "work in Kentucky and Virginia to keep all of those electrical machines running." *Id.* at 4–5. But, as discussed above, the operators of the shuttle car, continuous miner, and scoop machine are not transportation workers for their work using those machines. Therefore, those who perform electrical work on those machines are not transportation workers either.

3.  Work Involving the Beltline Does Not Turn
the Plaintiffs into Transportation Workers.

The continuous miner, scoop machine, and shuttle car were not the only pieces of machinery that Wolford worked on as an electrician.  He also "would perform maintenance and repairs on the electric motors that powered the beltline."  *Id.* at 6. Addair as a beltman "ensur[es] that the mine's conveyor belt system operates and functions properly."  *Id.* (quoting Prater Decl. 5, ECF No. 34-4).  As discussed above, the parties seek to strategically situate the plaintiffs near to and distant from the beltline, because it carries coal interstate.  Wolford and Addair are the closest to the beltline.  However, neither of their beltline duties make them transportation workers.

The plaintiffs cite a Ninth Circuit case for support.  In *Lopez v. Aircraft Service International, Inc.*, the court found that an airplane fuel technician who fuels airplanes that travel interstate was a transportation worker.  107 F.4th 1096, 1101 (9th Cir. 2024).  In its affirmance, the Ninth Circuit found that "the district court faithfully applied *Saxon*'s analytical framework, our precedent as set forth in *Rittmann*, and the guidance from cases involving similar statutory language."  *Id.* at 1103.  The district court had contrasted the fuel technician with "a truck mechanic whom another district court had found ineligible for the transportation worker exemption."  *Id.* at 1098.  The fuel technician "is closer both physically and temporally to the actual movement of goods between states than a truck mechanic who works on trucks that move goods in interstate commerce."  *Id.* (quoting *Lopez*

20

*v. Aircraft Serv. Int'l, Inc.*, No. CV 21-7108-DMG (Ex), 2022 WL 18232726, at *3 (C.D. Cal. Dec. 9, 2022)).  As the court of appeals noted, "Lopez, whose duties included physically adding fuel to planes, was directly involved in the transportation itself, *not only the maintenance of the means by which goods were transported*."  *Id.* (emphasis added).

Here, Wolford as an electrician "would perform maintenance and repairs on the electric motors that powered the beltline."  Pls.' Resp. Opp'n Mot. Compel 6, ECF No. 37.  Addair, as a beltman, "ensur[es] that the mine's conveyor belt system operates and functions properly."  *Id.* (quoting Prater Decl. 5, ECF No. 34-4).  These jobs simply ensure "the maintenance of the means by which [coal is] transported."  *Lopez*, 2022 WL 18232726, at *3.  This is distinct from the transportation of the coal itself.  The work of a beltman and of an electrician is "physically and temporally" removed from the coal's interstate transportation.  *Id.*  It therefore does not qualify Wolford or Addair as transportation workers.[7]

---

[7]  The plaintiffs argue that the fact they use heavy machinery to transport the coal across the state line instead of carrying it by hand should not be held against them.  Pls.' Resp. Opp'n Defs.' Mot. Compel 9–10, ECF No. 37.  But a truck carries quantities of goods through interstate commerce that individuals could not transport themselves.  And the district court in *Lopez* still observed that performing maintenance work on a truck does not render one a transportation worker.

4. Wolford's Crossing of the State Line Does Not
Make Him a Transportation Worker.

The plaintiffs also argue that Wolford is an "obvious" transportation worker because, when he worked at other mines besides Paw Paw 2, he had to cross the state line. *Saxon*, 933 F.3d at 501. Before and after his shift, he had to carry "tools, protective equipment, parts and supplies needed for repairs" between Kentucky and Virginia. Pls.' Resp. Opp'n Defs.' Mot. Compel 12 n.15, ECF No. 37. This was because the miners' bathhouse and the mine entrances were on opposite sides of the state line. But his crossing of the state line is not enough.

The First Circuit wrote that electricians who "complete deliveries of light fixtures shipped from out of state" can be transportation workers even though they also install the fixtures. *Fraga v. Premium Retail Servs., Inc.*, 61 F.4th 228, 242 (1st Cir. 2023). In other words, doing work that may not qualify for the exemption on its own would not disqualify an employee if they also did work that justified the exemption. *Id.* But Wolford's crossing of the state line with tools needed for his shift is not the same thing as an electrician delivering out-of-state light fixtures to consumers. The repair parts and protective equipment are not goods to be delivered to the purchasers of defendants' coal products. They are incidental to his work as an electrician ensuring the machinery is in working order. As the defendants point out, the district court on remand articulated the distinction: "[T]ransport workers move people and *merchandise* in interstate commerce." *Fraga v. Premium Retail Servs.,*

22

*Inc.*, 704 F. Supp. 3d 289, 299 n.5 (D. Mass 2023) (emphasis added). Wolford was not carrying tools according to a delivery order. He was doing so to fulfill his work as an electrician, which was not that of a transportation worker.

As a final matter, the plaintiffs cite *Lopez* to argue that all of their roles count as transportation work. They argue that Wolford, Addair, and McCoy are engaged in "keeping running Defendants' massive underground coal mining machinery." Pls.' Resp. Opp'n Mot. Compel 9, ECF No. 37. They "feed the belt which conveys coal across state lines and are, as a practical matter, part of the interstate transportation of goods." *Id.* But *Lopez* quoted the district court's distinction between work that is part of a good's transportation and work that is part of the maintenance of the means by which the good is transported. Here, the distinction is also between the transportation of the coal and the extraction of it from the seam. And the beltline, while it does carry the coal across the border, does not render its maintenance employees transportation workers. As a result, Wolford, McCoy, and Addair are not transportation workers.

### D. The Supreme Court's Reasoning and the FAA's Legislative Purpose Favor the Defendants' Interpretation.

Further supporting the defendants is the reiterated intention of the Supreme Court for the residual clause to have a "narrow" scope. *Bissonnette*, 601 U.S. at 256 (quoting *Circuit City*, 532 U.S. at 118). In the rare instances that the Fourth Circuit

addressed the transportation worker issue, it cited the Supreme Court's requirement that the exemption be given a "narrow construction." *Amos*, 74 F.4th at 596 (quoting *Circuit City*, 532 U.S. at 118); *see also Adkins*, 303 F.3d at 505 ("§ 1 of the FAA represents a narrowly targeted exception to a well-established, broad preference in favor of arbitration. As such it must be construed narrowly."). The FAA itself "was a response to hostility of American courts to the enforcement of arbitration agreements, a judicial disposition inherited from then-longstanding English practice." *Circuit City*, 532 U.S. at 111. The FAA "compels judicial enforcement of a wide range of written arbitration agreements" to "give effect to this purpose." *Id.* Reading the exemption narrowly further supports that the plaintiffs do not "play a direct and 'necessary role in the free flow of goods' across borders." *Saxon*, 596 U.S. at 458 (quoting *Circuit City*, 532 U.S. at 121).

## IV. CONCLUSION.

The work that these plaintiffs performed was too removed from the transportation of coal via the channels of interstate commerce. Their work extracting coal from the seam does not qualify them as transportation workers. Accordingly, Defendants' Motion to Compel Arbitration and Stay the Lawsuits of Jonathan Wolford, Joshua McCoy, and James Addair, ECF No. 34, is GRANTED. The prior Motion to Compel Arbitration and Stay the Lawsuit of Jonathan Wolford, ECF No. 13, is terminated as MOOT.

It is so **ORDERED**.

ENTER:   January 28, 2025

/s/  JAMES P. JONES
Senior United States District Judge